IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TRANSPORT TRUCK & TRAILER,<br>INC., an Idaho Corporation;<br>TRANSPORT EQUIPMENT LEASING,<br>LLC, an Idaho Limited Liability Company,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FREIGHTLINER LLC, a Foreign Limited<br>Liability Company;<br><br>                    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV-06-282-S-BLW<br><br>**MEMORANDUM**<br>**DECISION** |

## INTRODUCTION

The Court has before it a motion (and amended motion) for summary

judgment filed by defendant Freightliner.  The Court heard oral argument on

August 21, 2008, and the motions are now at issue.  For the reasons expressed

below, the Court will grant the original motion for summary judgment, mooting the

amended motion.

## FACTUAL BACKGROUND

1.    <u>Franchise Relationship</u>

Plaintiff Transport Truck and Trailer (TTT) is a franchised dealer of trucks

and tractors for manufacturer Freightliner, a subsidiary of Daimler-Chrysler.  The relationship between TTT and Freightliner, which began in 1995, was set forth in three Sales and Service Agreements (SSAs).

Plaintiff Transport Equipment Leasing Inc. did not enter into any agreement with Freightliner but operated an equipment leasing business in tandem with TTT's Freightliner dealership.  In 2000, Freightliner notified TTT of the termination of the franchise relationship.  As a result of arbitration between the parties, TTT was not terminated at that time.

Earlier, in July of 1999, Freightliner had entered into an arrangement with Travel Centers of America to provide Freightliner service points throughout the nation.  Pursuant to that national arrangement, a local TA Truckstop (part of Travel Centers of America) was reconstructed to provide Freightliner shop service and to maintain a Freightliner parts department.  The TA Truckstop was located within a mile from TTT's facility.

In July of 2001, TTT lost its financing with CitiCapital.  TTT sued CitiCapital in September of 2002.  TTT alleges that Freightliner provided confidential information regarding TTT to CitiCapital without TTT's authorization.

TTT's principal, Bill Howell, formed a new entity called Idaho Freightliner,

and sought to obtain approval from Freightliner to take over the franchise from TTT, and also sought a floor plan from Daimler-Chrysler.  However, Daimler-Chrysler rejected Idaho Freightliner's financing application, and Freightliner rejected its request to take over the franchise from TTT.

In 2004, Freightliner authorized another entity to open a new factory dealership in Nampa, Idaho.  TTT alleges that the new factory was within TTT's traditional market area.  The new dealership began advertising to announce its opening, and Freightliner placed an advertisement soliciting employees to staff the Nampa operation.

Howell operated a limited liability company known as Howell Overland Road, that owned land in Meridian, Idaho.  This Meridian property was apparently where TTT (or Idaho Freightliner) would relocate if the approvals had gone through.  Because the approvals were not obtained, Howell Overland Road claimed that it lost money.

**2.      Termination & Administrative Proceedings**

In 2004, Freightliner notified TTT, for the second time, that the franchise would be terminated.  TTT filed a protest with the Idaho Transportation Department (ITD).  An administrative hearing was held before Hearing Officer Michael Gilmore, who heard testimony and issued detailed findings of fact along

**Memorandum Decision and Order – Page 3**

with a recommendation to the ITD Director.

The issue before Hearing Officer Gilmore was whether Freightliner complied with Idaho statutory law governing franchise terminations when it terminated its relationship with TTT.  Under Idaho law, a manufacturer cannot terminate a franchise for violation of franchise terms unless (1) the terms are reasonable, and (2) the manufacturer acts in good faith.  *See* Idaho Code §§ 49-1613, -1614.

Hearing Officer Gilmore recommended that the Director allow the termination.  He found that the termination was justified by TTT's failure to (1) have financing, (2) reach reasonable sales levels, and (3) maintain reasonable inventories of new vehicles.  *See Findings of Fact* at p. 25.  With regard to TTT's allegations that Freightliner acted in bad faith, Hearing Officer Gilmore found as follows:  (1) Freightliner did not act in bad faith in refusing TTT's application to have Idaho Freightliner take over the Freightliner dealership; (2) Freightliner did not act in bad faith by insisting that TTT submit financial information; and (3) Freightliner did not act in bad faith to prevent TTT from obtaining a floor plan.  In making these rulings, Hearing Officer Gilmore also found for Freightliner on TTT's claims that Freightliner (1) overstocked TTT with inventory, causing it to lose its floor plan; (2) halted its termination of TTT in 2001 when it learned that it

might be responsible for the overstock; (3) stopped sending sales assistance to

TTT; and (4) undermined TTT by the conduct of Treasurer Kelley Pratt who sent

e-mails to the CEO regarding consignment policies, altered CitiCorp to the sale of

assets by Howell, and allegedly torpedoed TTT's application for a floor plan.  On

December 6, 2004, the Director adopted these findings and denied TTT's protest.

*See Exhibit C to Affidavit of Christiansen.*

TTT filed in state court a petition for judicial review of the ITD decision.

On February 28, 2005, that petition was dismissed by stipulation of the parties.  *Id.*

## 3.    **This Suit**

TTT filed this suit on January 13, 2006, in state court.  It was removed to

this Court on July 7, 2006.  TTT filed a First Amended Complaint on September 8,

2006, containing seven counts:  (1) breach of the implied covenant of good faith &

fair dealing; (2) intentional interference with contract (based on Freightliner's

alleged statements to existing and prospective TTT customers that TTT would not

be a Freightliner dealer for long); (3) intentional interference with prospective

economic gain (based on allegations that Freightliner and Daimler-Chrysler sought

to drive TTT out of business by denying financing, setting up competing entities in

TTT's market area, and making disparaging comments to TTT customers); (4)

intentional interference with prospective economic gain (based on plaintiff Howell

Overland Road losing a real estate deal due to defendants' conduct); (5) violation of Idaho Code § 49-1613 (based on allegations that Freightliner's conduct in seeking the franchise termination was a bad faith attempt to run TTT out of business); (6) conspiracy to intentionally interfere with prospective economic gain (based on a conspiracy between Freightliner and Daimler-Chrysler to deny financing, terminate the franchise, and reject the application of Idaho Freightliner to take over for TTT); and  (7) violation of the Idaho Consumer Protection Act (based on Freightliner's disparaging comments to TTT customers).

**4.    <u>Prior Proceedings</u>**

In the first round of motions to dismiss filed by Freightliner and Daimler-Chrysler, the Court dismissed Counts Six (conspiracy) and Seven (Consumer Protection Act).  The Court also found that TTT was entitled to amend Counts Four (Howell Overland Road claim) and Five (violation of Idaho Code § 49-1613) to cure deficiencies in those claims.  In addition, the Court ordered TTT to amend its allegations that Freightliner acted in bad faith by not approving Idaho Freightliner to take over the franchise from TTT.  The Court directed that this amendment include allegations that specifically were not addressed in the ITD decision.

In response to the Court's ruling, TTT filed a Second Amended Complaint

**Memorandum Decision and Order – Page 6**

on February 26, 2007.  This complaint dropped Howell Overland Road and the

individual Howells as plaintiffs –  along with Count Four, which was related to the

Howells' alleged damages.  It also drops Idaho Freightliner as a plaintiff.  The only

two remaining plaintiffs are now TTT and Transport Equipment Leasing, Inc.

The Second Amended Complaint pared the original seven counts down to

four:  (1) breach of contract; (2) intentional interference with contract (on behalf of

TTT only); (3) intentional interference with prospective economic gain (on behalf

of TTT and Transport Equipment Leasing); and (4) violation of Idaho Code § 49-

1613.

Freightliner filed a motion to dismiss under Rule 12(b)(6), which the Court

granted in part, dismissing allegations that Freightliner wrongfully rejected the

transfer of the franchise from TTT to Idaho Freightliner.  The Court found that this

allegation was resolved in the IDT hearings and was entitled to preclusive effect in

this case.  The Court also held that TTT's damage claims were limited, and that it

could not go further back than July 19, 2002, (by virtue of the 4-year statute of

limitations) to seek damages for its interference and statutory violation claims.

Freightliner now seeks summary judgment on all remaining claims.  The

Court will discuss first the standard of review, and then resolve the motion.

**Memorandum Decision and Order – Page 7**

## ANALYSIS

### 1.  <u>Summary Judgment Standard of Review</u>

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings.  *Id.*  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001)(en banc).  To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply

point out the absence of evidence to support the nonmoving party's case.  *Fairbank*

*v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

   This shifts the burden to the non-moving party to produce evidence

sufficient to support a jury verdict in her favor.  *Id.* at 256-57.  The non-moving

party must go beyond the pleadings and show "by her affidavits, or by the

depositions, answers to interrogatories, or admissions on file" that a genuine issue

of material fact exists.  *Celotex,* 477 U.S. at 324.

   However, the Court is "not required to comb through the record to find some

reason to deny a motion for summary judgment."  *Carmen v. San Francisco*

*Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac.*

*Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Instead, the "party

opposing summary judgment must direct [the Court's] attention to specific triable

facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th

Cir. 2003).

**3.    Count One – Breach of Implied Covenant of Good Faith & Fair Dealing**

   In Count One, TTT alleges that Freightliner's authorization of the TA Truck

Stop beached the implied covenant of good faith and fair dealing contained in each

SSA.  As discussed above, Freightliner had entered into an alliance in 1999 with

TravelCenters of America, which operated "TA Truck Stops" nationwide.  The

alliance allowed 162 TA Truck Stops across the nation to stock Freightliner parts

and perform certain light maintenance and repairs on Freightliner trucks, including

some warranty repairs.

In July of 2001, the TA Truckstop just a few blocks from TTT's facility

began stocking Freightliner parts and doing Freightliner repair work.  It competed

directly with TTT; vehicles leaving the freeway to travel to TTT's shop would

have to drive past the TA Truckstop to arrive at the TTT facility.  TTT filed an

objection with the IDT but it was denied.

As the Court recognized in an earlier decision, the SSAs granted only

"nonexclusive" rights to TTT, and thereby allowed Freightliner to authorize

competing operations in TTT's territory.  At the same time, the Court found,

Freightliner's freedom to authorize competition is not a license to act in bad faith.

The Ninth Circuit made just this distinction in *Vylene Enterprises, Inc. v.*

*Naugles*, 90 F.3d 1472 (9th Cir. 1996).  There, a franchisee without any exclusive

territory claimed the franchisor breached the implied covenant by placing a

competing business just a mile-and-a-half away.  The franchisor responded that

**Memorandum Decision and Order – Page 10**

such an implied covenant would directly contradict the non-exclusive nature of the franchise. California law governed, and it was similar to that of Idaho and Oregon.[1]

The Circuit held that the franchisee, while "not entitled to an exclusive territory, is still entitled to expect that the franchisor would not act to destroy the right of the franchisee to enjoy the fruits of the contract." *Id.* at 1477. Besides placing the competing business so close to the franchisee, the franchisor also took other action that the Circuit found was a bad faith attempt to run the franchisee out of business. Specifically, the Circuit noted that the franchisor was cutting off its own source of royalties, and thus its conduct could only be explained as an effort to destroy the right of the franchisee to enjoy the benefits of the contract. *Id*.

The Court found that the Idaho and Oregon courts, if faced directly with the question, would follow *Vylene*. TTT's lack of exclusive territory does not give Freightliner the right to prevent TTT from enjoying the benefits of the contract. The critical question in that determination is whether Freightliner's actions provide little or no economic benefit to Freightliner, while working to TTT's detriment and impairing its ability to enjoy the benefits of its contract with Freightliner.

---

[1] California law similarly provides that an implied covenant of good faith and fair dealing will not be read to vary the express terms of a contract. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 826 P.2d 710 (Calif.Sup.Ct. 1992)(*en banc*).

**Memorandum Decision and Order – Page 11**

Freightliner submitted evidence distinguishing this case from *Vylene*.  Here, Freightliner argues, there is unrebutted evidence that competition between the TA Truck Stop and TTT would benefit Freightliner financially, unlike *Vylene* where the franchisor was getting no benefit – in fact, cutting off its own royalty source – when it opened the new operation.

More specifically, Freightliner submitted evidence that its nation-wide alliance with TA Truckstop was approved by a steering committee of dealers who endorsed the plan as beneficial to Freightliner and the dealers.  *See Giesemann Deposition* at pp. 60, 87.  The TA Truckstop could refer customers to TTT for heavier repairs or Freightliner truck purchases, purchase its parts from TTT, and be open 24 hours a day as opposed to TTT's more limited hours of operation.  *See Johnson Deposition* at pp. 118 to 120.  This evidence shows that Freightliner benefitted from its arrangement with a TA Truckstop even though it was just a few blocks from TTT.

What evidence did TTT submit that cast doubt on Freightliner's evidence of financial advantage and create issues of fact?  TTT did not cite the testimony of any expert witness in its briefing, supporting papers, or oral argument.  The Court therefore assumes TTT has no expert testimony to rebut Freightliner's arguments on this issue.

**Memorandum Decision and Order – Page 12**

In its opening brief, Freightliner sought to exclude the testimony of Richard Neville, apparently proffered by TTT as an expert witness.  From Freightliner's arguments, it appears that Neville testified that the placement of the TA Truckstop was an "extreme deviation" from "industry standards."  Freightliner objected to Neville's testimony, arguing that he could not point to any "industry standards."

TTT never responded to that argument, either in the briefing or the oral argument.  Moreover, TTT never attached Neville's report to its filings in response to Freightliner's motion for summary judgment, and never mentioned Neville's findings in any of its briefing.  The sole reference to Neville comes in Freightliner's briefing.  While Neville's report may be contained somewhere in the record, it is TTT's responsibility to identify it for the Court, use it to support claims, and defend it from Freightliner's challenges.  Having failed to do so, TTT waives its right to rely on Neville's opinions.

TTT argues that it did submit evidence similar to that in *Vylene* by showing that Freightliner refused to allow TTT to buy trucks for cash – TTT describes this refusal as "counterintuitive, as it would damage not only TTT in its ability to operate its business, but would also reduce Freightliner's own profitability in the Boise market."  *See TTT Brief* at p. 8.

However, TTT submits no evidence that Freightliner's refusal to allow TTT

**Memorandum Decision and Order – Page 13**

to buy trucks for cash – which was part of Freightliner's insistence that TTT have a

flooring plan – made no business sense.  TTT lost this same argument before the

IDT, which found that Freightliner's rejection of cash purchases and insistence on

a floor plan was reasonable because a floor plan was "essential for TTT to conduct

its dealership business on the scale that the parties contemplated." *Findings of*

*Fact* at p. 18.  TTT argument here that Freightliner's insistence on a floor plan and

refusal to allow cash purchases makes no business sense is precluded by the ITD's

finding that it was reasonably based on a business purpose.

TTT alleges that other evidence raises an issue as to whether Freightliner so

disliked Howell that they wanted to punish him.  In support of this argument, TTT

points to an e-mail from Monte Mehring, Freightliner's Director of Dealer

Operations.  Mehring's e-mail was in response to an e-mail from Freightliner's

April Kline asking if TTT's hours of operation have changed.  Mehring responded

that he had left a message for Howell but had no response, and did not expect one.

He then stated, "you already have Wild Bill in Boise on your Violator List." *See*

*Exhibit C to Affidavit of Counsel.*  The "Violator List" referred to by Mehring is a

list of dealers who were violating Freightliner's requirement – known as Annual

Operating Requirements Addendum (AORA) –  that dealers be open 24 hours a

day, 7 days a week.

**Memorandum Decision and Order – Page 14**

TTT also points to evidence that (1) Freightliner officials were monitoring TTT for violations of the SSAs (*see, e.g.*, *Giesemann Deposition* at p. 52); (2) Freightliner official Christopher Giesemann asked others in the company to document the "poor to non-support of the [Boise] TA site" by TTT and the Twin Falls Truck Center (*see Exhibit D to Affidavit of Counsel*); (3) Freightliner official Kelley Platt directed others in the company to "accumulate things like this in a file on [TTT]," referring to TTT's deterioration of its financial condition (*see Exhibit F to Affidavit of Counsel);* (4) Giesemann wrote an e-mail stating that "[w]e have to keep the pressure on [Howell] even though this time around, the arbitrator ruled against us on termination (*see Mehring Deposition* at p. 47).

In analyzing this evidence, it is crucial that the review of a claim for a breach of the implied covenant of good faith and fair dealing "is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions." *See Jenkins v. Boise Cascade Corp.,* 108 P.3d 380, 390 (Id.Sup.Ct. 2005). Analyzed with this standard in mind, this evidence does not raise questions of fact that Freightliner violated the implied covenant.

The Court turns first to the "Violators List." It is undisputed that TTT was violating the AORA with its limited hours of operation. While the IDT Hearing Officer found the hourly requirements unreasonable given the size of the Boise

market, he also found that TTT had agreed to operate during those hours. *See Findings of Fact* at p. 22, n. 32. Thus, Freightliner was doing no more than attempting to hold TTT to its agreement. If that is a tort, commerce will grind to a halt. Under *Jenkins* analysis, the enforcement of this contractual term – negotiated at arm's length by sophisticated business entities – cannot constitute a breach of the implied covenant of good faith and fair dealing.

Evidence that Freightliner was accumulating evidence of TTT's financial deterioration and breaches of the SSAs – and "monitoring" TTT – cannot be evidence of bad faith conduct. No business could operate without such monitoring and oversight – the franchisor has a brand name to protect and there is nothing in the SSAs or any industry practice submitted to this Court that would prevent Freightliner from monitoring TTT for financial deterioration and breaches of the SSAs.

The last two pieces of evidence are (1) the reference to "Wild Bill" and (2) Giesemann's e-mail about keeping pressure on Howell. The latter item raises no material issue of fact – a franchisor has a legitimate business purpose in pressuring his franchisees to adhere to their agreements. With regard to the nickname, it was given to Howell by Freightliner's Monte Mehring, who testified that "we've had kind of a rocky relationship with Bill over the years, and that was just my name for

Bill.  It had nothing to do with Bill other than my, I guess, nickname." *See*

*Mehring Deposition* at p. 18.  There is no evidence that the nickname signifies

anything other than the "rocky relationship" between Freightliner and Howell.

Every franchise termination is preceded by a "rocky relationship"  – if that is

enough to establish a breach of the implied covenant, every termination could be

challenged in court.  The nickname is, at most, "a mere scintilla of evidence" that

is "insufficient to withstand summary judgment."  *In re Ahaza Systems, Inc.,* 482

F.3d 1118, 1128 (9th Cir. 2007).

　　　　TTT argues that a question of fact is created because Freightliner's assertion

that it was contractually obligated to allow the TA Truck Stop to locate where it

wanted is put in doubt by evidence showing that Freightliner actually had

discretion as to its placement.  However, even assuming the evidence creates an

issue of fact over whether Freightliner had input into the decision to approve the

TA Truck Stop, that issue of fact is not material.  As explained above, TTT had no

right to exclusive territory.  Freightliner had the contractual right to approve

competitors to operate in TTT's territory.  Thus, the mere placement of a

competitor in TTT's territory, standing by itself,  cannot breach the implied

covenant of good faith and fair dealing.  TTT must show more, as specified in

*Vylene*.  That showing has not been made, as discussed above.

**Memorandum Decision and Order – Page 17**

TTT also alleges that Freightliner breached the implied covenant by providing confidential information to CitiCapital during TTT's litigation with CitiCapital.  The Court has already ruled that this matter was resolved by the IDT Hearing Officer who found that Freightliner did not act in bad faith in this regard. That finding is entitled to preclusive effect here, as the Court has previously held.

TTT next alleges that the opening of the Nampa store, and the soliciting of TTT employees to staff that store, constitutes bad faith.  TTT's counsel conceded at oral argument that the record contains no evidence of economic loss from the opening of the Nampa store, but asserted that TTT was nevertheless injured because an employee was enticed away from TTT to join the Nampa store, according to Howell's deposition testimony.

The Court refuses to consider this enticement claim.  TTT failed to raise it in their briefing – despite the fact that Freightliner flagged the issue in its opening brief – and raised it for the first time at oral argument.  That is unfair to Freightliner and results in a waiver of the argument.  *See O'Rourke v. Seaboard Surety Co. (In re E.R. Fegert, Inc.),* 887 F.2d 955, 957 (9th Cir.1989).

The record, therefore, establishes no actual injury from the opening of the Nampa store.  TTT must prove, as an element of its breach of the implied covenant claim, that the breach "result[ed] in contract damages."  *See Idaho First Nat. Bank*

**Memorandum Decision and Order – Page 18**

*v. Bliss Valley Foods*, 824 P.2d 841, 863 (Id.Sup.Ct. 1991).  TTT cannot prove that element of the claim.

Moreover, the Nampa store did not open until about a month *after* Freightliner terminated TTT.  There is no law that requires Freightliner to sit on its hands and wait some longer period before replacing a dealer.  That would be suicidal for any business.

TTT does allege that Freightliner prepared before-hand for TTT's termination by taking out a single newspaper advertisement in the newspaper stating that a new Freightliner dealership would be opening in Nampa and soliciting employees to staff that operation.  However, as discussed previously, TTT made no argument in its briefing or associated filings that any employee had been hired away by the Nampa store prior to TTT's termination, or that any TTT's customers were influenced by the single advertisement.

At oral argument, TTT's counsel argued that Freightliner violated Idaho Code § 49-1217 by making significant preparations – before termination – to open the Nampa dealership.  That claim does not appear in either the Second Amended Complaint or TTT's briefing.  It was raised for the first time at oral argument, and is hence waived.  For all these reasons, the Court finds that the opening of the Nampa store, and Freightliner's conduct regarding that store prior to its opening,

**Memorandum Decision and Order – Page 19**

do not provide the basis for a breach of the implied covenant claim.

Finally, the Second Amended Complaint alleges that Freightliner breached the implied covenant by disparaging TTT to DaimlerChrysler Services North America LLC (DCS), Freightliner's parent company's financing arm.  TTT said nothing about this claim in its briefing and separate statement of facts.  The Court will therefore consider this allegation waived.

The Court has now resolved each of TTT's allegations regarding the breach of the implied covenant, and will accordingly grant summary judgment dismissing this claim.

## 2.      Counts Two & Three – Interference Claims

In Count Two, TTT alleges that Freightliner's notification to existing customers that it was opening the Nampa factory dealership constitutes an intentional interference with contract.  As explained above, the record contains no evidence of economic loss from the opening of the Nampa store.  An element of the tort of interference that TTT must prove is that Freightliner's conduct "result[ed] in damage."  *See Highland Enterprises Inc. v. Barker*, 986 P.2d 996, 104-5, n.3 (1999).  TTT argues that it is entitled to nominal damages even without evidence of actual injury.  However, because actual damage is an element of the tort, "nominal damages are not awarded."  *See Restatement (Second) of Torts*,

**Memorandum Decision and Order – Page 20**

§ 907, comment a, at p. 462 (1979).  TTT cites no Oregon or Idaho cases that have

adopted a position contrary to the *Restatement*.  For this reason, Counts Two must

be dismissed.

Count Three – the interference with prospective economic gain claim –

alleges like Count Two that the opening of the Nampa store constitutes

interference.  That allegation will be dismissed for the reasons stated above.

Count Three also alleges that Freightliner's discussions with prospective buyers of

the Freightliner assets constituted interference.  TTT alleges that Freightliner

intentionally and wrongfully interfered with the negotiations between TTT and

prospective purchasers of the TTT dealership.  TTT lists three prospective

purchasers that were the object of Freightliner's alleged interference: (1) The Pape

Group, (2) Ken Cook of the Spokane Freightliner dealership, and (3) Smith Detroit

Diesel.

Freightliner argues that the Court must ignore any allegations concerning

Smith Detroit Diesel because TTT never provided any information on that

allegation during the discovery period, and thus Freightliner has had no

opportunity to address that allegation.  TTT did not respond to this argument, and

the Court accordingly will ignore TTT's arguments regarding Smith Detroit Diesel.

With regard to the other two prospective buyers – Ken Cook and the Pape

Group – Freightliner submitted the affidavits of Ken Cook and Steve Gross, the

General Manager of the Truck Division of the Pape Group, stating that the failure

to reach a deal with TTT was not due to any conduct or influence by Freightliner.[2]

TTT responds that the record contains evidence that creates issues of fact over the

accuracy of the Cook and Gross affidavits.  More specifically, TTT asserts that

Freightliner had contact with both Ken Cook and the Pape Group as they were

negotiating with Howell, and that these contacts at least raise an issue of fact over

whether Freightliner influenced the parties to pull out of any deal.

      With regard to the Pape Group, Howell testified that there were two

negotiations.  The first in 2003 involved negotiations over the value of goodwill.

Howell testified that the parties could not reach agreement on that value, as the

Pape Group believed Howell's valuation for goodwill was too high.  *See Howell*

*Deposition* at p. 185. Howell testified that negotiations were "re-instigated" in

2004 when the parties negotiated an asset sale with no goodwill.  *Id*. at pp. 174-

177.

      Howell testified that the "dealbreaker" for these 2004 negotiations with the

Pape Group was that they wanted to close the sale after the IDT termination

---

[2] For example, Gross filed his affidavit stating that he was "primarily responsible" for the negotiations, and that "[t]he decision by the Pape Group to not purchase [TTT] was not the result of any conduct by Freightliner or by any of its employees, representatives, or agents."  *See Gross Affidavit* at pp. 3-4.

**Memorandum Decision and Order – Page 22**

hearing to give themselves an excuse "to not conclude the sale based upon a determination at the [IDT] hearing." *Id*. at p. 178. Howell refused to extend the sale closing date, and that ended the negotiations.

Howell speculates in his deposition that Freightliner told the prospective purchasers of TTT about the IDT termination hearings. *Id*. at 219. According to Howell, it was this knowledge that led prospective purchasers to seek a closing date after the hearing so that they could pull out if necessary. Assuming this to be true, it does not raise any questions of fact concerning tortious interference. The record shows that the prospective purchasers initiated the contact with Freightliner seeking information. TTT cites no authority that informing another of a state administrative hearing constitutes a tort. The Court will therefore grant summary judgment dismissing the allegations that Freightliner interfered with the 2004 negotiations for an asset sale with the Pape Group.

The same flaw infects the allegations in Count Three that Freightliner interfered with the sale to Ken Cook. Howell testified that he never responded to Cook's offer because he decided to pursue an offer with the Pape Group. *Id*. at p. 217. Thus, it was Howell's own failure to address Cook's offer that sunk that deal, and not any interference by Freightliner.

TTT asserts that Freightliner knew of a confidentiality agreement between

**Memorandum Decision and Order – Page 23**

the prospective purchasers and TTT, and yet nevertheless communicated with the prospective purchasers.  TTT cites no authority that such a confidentiality agreement would bind a non-signatory like Freightliner, and no authority that knowledge of such an agreement imposed a duty on Freightliner to remain silent when contacted by a prospective purchaser.

TTT argues, however, that it raises questions of fact concerning whether Freightliner interfered with the Pape Group sale in 2003.  Those 2003 negotiations concerned the value of goodwill and failed, according to Howell, when the parties failed to reach agreement on that valuation.  In contrast, the 2004 negotiations involved no discussion of goodwill and failed due to Howell's refusal to extend the closing date, according to his own testimony.  In other words, Howell's own testimony treats the two negotiations as separate and distinct.

This becomes important because the Second Amended Complaint contains no allegation in Count Three concerning the 2003 negotiations – the Complaint's allegations are expressly limited to 2004.  Hence, the Court will disregard TTT's arguments that there are questions of fact that Freightliner interfered with the 2003 negotiations with the Pape Group over the value of TTT's goodwill.

In paragraph 62 of Count Three, TTT alleges that the opening of the TA Truck Stop just blocks from TTT's operation constitutes tortious interference.  The

Court's discussion of this issue above resolves this claim.  Freightliner was abiding by the terms of its agreement with TTT in placing a competitor within TTT's non-exclusive territory. There is no evidence that it was done in bad faith or in any wrongful manner.  Hence there is no tortious interference claim.

In paragraph 63 of Count Three, TTT alleges that Freightliner committed tortious interference by "wrongfully and arbitrarily denying TTT's application for a flooring line of credit."  This issue was resolved at the IDT hearing in Freightliner's favor and, under the Court's prior rulings, that IDT ruling has preclusive effect here.

These rulings have now resolved all the allegations in Count Three.  The Court will accordingly grant summary judgment on Count Three.

**3.    Count Four – Violation of Idaho Code § 49-1613**

In Count Four, TTT alleges that Freightliner's authorization for the TA Truck Stop violates Idaho Code § 49-1613(3)(n), which prohibits a franchisor from engaging "in any predatory practice or discrimination against any dealer." TTT alleges that the authorization of the TA Truck Stop was a "predatory practice[] and/or discrimination against TTT."  *See Second Amended Complaint* at ¶ 69(d).

In an earlier decision, the Court held that the common definition of

**Memorandum Decision and Order – Page 25**

predatory practice would include conduct designed to run somebody out of business, but does not include conduct that is merely unfair.  Freightliner alleges that the record contains no evidence that it was engaged in the predatory practice of running TTT out of business.

The Court's resolution of Counts One through Three resolves this Count as well.  There is no evidence of predatory practices here, and Count Four must be dismissed.

**5.    <u>Conclusion</u>**

The Court will therefore grant Freightliner's motion for summary judgment, rendering moot its amended motion for summary judgment. The Court will issue a separate Judgment as required by Rule 58(a).



DATED:  **September 10, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge